This is the case of Mary Mimms, Individually and Administrator of the Estate of Letitia Mimms versus Dr. Emmanuel Pantel, 19-12-85. Our procedure, well I'll introduce who you've got here. You've got myself, Justice Smith. You've got judges Cynthia Cobbs and Terry Lavin. We're from the First District, Second Division of the Appellate Court. The procedure we'll follow is that the appellant will have the first opportunity to present their case and you get 10-15 minutes and we don't interrupt you. We ask questions after you've completed your presentation. Then the appellee will have their chance to make their presentation and the same is true. Finally, the appellant will close. And with that in mind, I see three pictures here, so I'm not sure do we have two or three people going to talk. It's just Mr. Vincent and Mr. Blandon, correct? Yes, Your Honor. Okay. And who's on the other side? Those are co-counsel. Okay. Yeah. All right, you may proceed. Thank you, Your Honor. Good morning, Justices. May it please the court. My name is Stephan Blandon. I'm here on behalf of the appellant, the estate of Latasha Mims. We are requesting that this court overturn the jury's verdict in the trial court's post-trial motion as against the manifest weight of the evidence. I'm fully cognizant of how rare and how unusual a request. We lost your voice. Are you able to hear me now, Judge? Yeah. I'm sorry. If that happens, please let me know. I'm very afraid that this is going to cut out. But the significant... We have a wonderful system we're working under. Go ahead. Yes, it is. In any event, what took place in this case is completely unprecedented. We have a statute that was created for specifically this situation, a Nursing Home Care Act statute that's specifically created for the purpose of protecting and preventing abuse and neglect from nursing homes. That was violated by Dr. Painesill in this case that led to undisputed admitted pain and suffering. Now, granted, the trial involved a number of issues that are not in dispute or not being challenged in this proceeding. We are not appealing the wrongful death verdict. We are focused on the survival action in this case. It was undisputed in this case that the decubitus ulcers were not properly treated or cared for and that Dr. Painesill was aware of this on a repeated basis, that he forged records, that he specifically did not document that this neglect was taking place, that his orders were being violated, and that this contributed to the uncontested pain and suffering that was caused to Latasha for the untreated decubitus ulcers that she received. Clearly, the record is abhorrent. This defendant testified he did not do these things for his own financial gain. He was afraid of being punished by the nursing home if he reported these things and, in fact, cited instances where that had happened. And in this case, it's uncontroverted that there is a non-delegable duty on the part of the defendant under the statute to report all instances of suspected abuse and neglect. And the trial court made that finding as well on post-trial. What we have in this case is the defense argument on causation. The defendants contended that the jury could have determined that the causation element was missing. And that's specifically why we are not challenging the wrongful death aspect of the verdict and are focused on the neglect and the decubitus ulcers that he admitted were present, that he observed, that he purposefully did not chart and purposefully did not contact the Illinois Department of Public Health. This particular defendant was in the nursing home 88 times to inspect and treat this patient over 22 months. He testified that on repeated occasions he observed that his orders for hydrocodoid dressings, which are used as a barrier to protect, it's a gelatin seal to protect the ulcers so that you don't have them contaminated in the pain caused by feces and urine. The defense goes out of its way to make an argument that the jury could have concluded that it was unavoidable that the patient would have lied in her own feces and urine. That's not the issue. The issue in this case is this defendant wrote repeated orders to have a protective barrier placed, a dressing place that would have prevented feces and urine from coming into contact with an ulcer that went at different points in time through the fat layers, the tendons, and down to the bone, causing extreme pain and suffering as evidenced by the photographs and the testimony that were part of the record. And the defendant acknowledged in this particular case that he did not notify IDPH as was required, which is completely contrary to the statute. Now, to cut to the chase, the defendant contends in their brief that even if Dr. Painesill made a report, it would not have uncovered any abuse or neglect nor changed or affected the care that LaTosha Mims received. The point of the matter is whether abuse was taking place or not. Dr. Painesill testified he thought abuse was taking place, both physical and sexual abuse. He was told by the mother that abuse was taking place, and that suspicion triggered the notification requirement under the statute. And the case law that we've cited to makes clear under Lemkin and Dorsky that there is absolutely no question that if you have a suspicion, that takes away the discretion from the physician or the examiner, and you are required to report to IDPH. So that you will have an immediate investigation done within 24 hours. And what would have occurred during each one of those calls had they taken place is IDPH would have come out and conducted an investigation. And there are a litany of items that are listed in the statute as to the steps that are supposed to be taken to protect the patient. From contacting in severe instances, the police department, the Department of Health and Human Services, but more importantly to provide additional nursing care, remove the patient from the facility if necessary, all to protect the patient. And in this case, at trial and in argument, there was no argument or evidence or suggestion that the state would not do its job. The only place that appears is in the defense, the appellee's brief, where they contend that the jury was free to conclude that the state would not do its job to protect the most vulnerable in this case. And that's contrary to the evidence, it's contrary to the testimony, and it has to be contrary to the public policy of the state of Illinois to suggest that the Illinois Department of Health and Human Services would not do its job. We lost you again. We're losing you. I'm sorry, Your Honor. Are you able to hear me now? Yeah. It just got wobbly for a minute or so. Not even a minute. 10 seconds. You're out again. Still out. You're out. You're not on. Well, I know a lot of people would like to find my mute button like that. I've got it right here. I think I was born with that one. Try again. So make sure the court can still hear me right. Yeah. Thanks. Excuse me, Justice Smith. Mr. Blandon, are you trying to sign in through a phone number. Any better. Mr. Blandon. Yeah, you're back. Okay. Excuse me, Justice Smith, Mr. Blandon, are you trying to sign in through a phone number. We have been signed in through our phone. Yeah. Is that the, the 312-458-1000. Yes, sir. Okay. I just want to make sure. Thank you. Proceed. Thank you, Your Honor. So what we have in this case is a statute that placed a non delegable burden on behalf of Dr. He repeatedly observed and saw the neglect taking place of orders that he had issued to protect the barrier, not being fulfilled and rather than charting them. He forged the records to say that it was being done when it was not being done. And had he contacted the state, the state would come in during those 88 times he was there each and every time he would have observed the neglect. And they would have taken the appropriate steps to protect the patient and changed the outcome. And to suggest somehow that that would not have occurred is not based on the evidence. It's not based on the testimony or the expert. And it has to be void is against the public policy of the state of Illinois to suggest that a jury is free to conclude that the state agency charged with protecting the most vulnerable patient would do its job. And there is a there is a passing reference to that that's made by defense by the appellee and their brief without any support to the record case law or evidence. In addition to the neglect that was taking place as a result of the failure to follow orders, which the defendant saw and covered up and changed records. There's the entire issue of the cuts in the bruising that the patient received. There was testimony that was submitted that that was as a result of abuse. In fact, that's what the defendant, Dr. Painsil, testified to. He thought someone was hitting her. The defense produced experts that testified. Well, we think it was as a result of her falling and therefore these are explained in that manner. The point is, regardless, if she received all of those cuts and bruises that were testified to that are in the medical record and the photographs that are part of this appeal as a result of falling, that is evidence in and of itself of neglect, repeated neglect. This is a patient who Dr. Painsil described as an incomplete quadriplegic who was incapable of moving, who was incapable of inflicting these wounds herself. So you have a record of profound, prolific neglect that is taking place, both because orders are not being followed and this patient who is described as a near quadriplegic is repeatedly falling and injuring herself. If that is not neglect, I don't know what is neglect. If this statute, the purpose of the statute, which was created to protect these patients, does not force a doctor like Dr. Painsil to contact them to have the IDPH come out and do its job, I can't imagine a scenario or a situation under which it ever could or would. Okay, counsel, I'm going to interrupt you at this point. Just to go through some basics, and I'm not trying to be condescending, you're obviously an extremely capable lawyer and have been handling cases like this for as long as I did. But you have to prove three things, not just negligence. You've got all sorts of negligence in your argument, you have negligence all over your appellate brief. And there was evidence of failure to follow this doctor's orders at nursing homes, there were problems at hospitals. She was in six nursing homes, five hospitals. And she had a terminal, fatal, untreatable condition, testified to by Dr. Young, a neurologist and physiatrist that you and I both know quite well. And he testified that there was nothing that could have been done to take care of this, incurable, terminal. Yes, yes. And the jury in this case, remarkably enough, I've argued a long time about sole proximate cause, okay, you may have read some of this stuff. I've argued that if the sole proximate cause instruction is appropriate, then the pre-existing condition instruction should be given, the aggravation. That's what the judge did in this case, both of those instructions were given. And it's entirely possible and defensible that the jury decided that the sole proximate cause of all of the problems that she had and the difficulty treating things and people not following doctor's orders was the condition itself. Okay, so I don't know how you overcome that. You have to prove to us or we have to find that the jury's verdict was unreasonable, number one, arbitrary, and not based on any of the evidence. How the heck can we do that? How can we do that? Two things, Your Honor, and you're absolutely correct. The first is I am not contending, we are not contending that her death is in any way related, period. So there was a big fight at trial about whether this was as a result of pre-existing conditions that could not be prevented and this was an eventual condition and she was going to deteriorate and have this horrible death. We are not appealing that aspect at all. What I am focused on is the doctor's testimony, the unrebutted evidence that she was lying in feces and stool and urine, which was extremely painful. I am focused on the pain and suffering aspect of that incident. I get that, but the issue that I have with that legally is that, you know, there are other, there are plenty of empty chairs in this case, okay? You have the nursing homes that you settled with, right? Settled for $900,000. The jury could find that the underlying condition was the sole proximate cause or the jury could have found that it was the conduct of the nurses not following the doctor's orders that led to the woman having problems with pain, with the decubitus ulcers, etc. And in the absence of a special interrogatory, I don't see how we can give you any relief. Another point I'd like to make is you have not, as Justice Lavin said, Dr. Young is considered an expert and we all know him and I know you've used him because you guys had a case in front of me in the law division. My point is to refute him when he says that the doctor is not negligent, not responsible in effect because he took over when the situation was irreversible state and he's not responsible for anything that happened. So there's no question that Dr. Young is preeminent and is qualified and what he testified to was specifically focused the cause of death. He was testifying as a neurologist about the encephalopathy and the conditions that led to her death and saying that there was nothing that the defendant did that played any role in causing her death. Yeah, but 90% of your cross-examination of Dr. Young had nothing to do with causation. It was all about the failures of people not following orders or not taking care of this woman. There's absolutely no question that the majority of the trial. You're out. How about now? Can you hear me now? Yeah. The majority of the trial was on the death issue. Young's testimony was on the death issue. I'm focusing this appeal on the pain and suffering that was caused solely by not having the wound, the pressure ulcer bandaged. There were specific bandages and medication that were supposed to be placed that were not there. The pain still ordered. He saw and he covered up. That's it. That's the only focus of this appeal. Since we're not letting you speak without interruption, I might as well join my colleagues and interrupt you. Isn't there evidence also in the record that Ms. Nims suffered from these ulcers even after she left the facility and before she even came under Dr. Paintsill's care? I mean, isn't there just conflicting testimony about all the unfortunate incidents of this degenerative disease, not just what happened while she was under Dr. Paintsill's care? I'm not suggesting in this appeal that they caused her ulcers. I am suggesting in this appeal that the time period that she had ulcers for which she was not receiving treatment that Dr. Paintsill ordered and he knew that she wasn't getting was painful, caused suffering, and that that was not challenged and was unrebutted. So you have periods of time where she has open exposed wounds that are supposed to have duoderm dressing. Hydrocolide is the generic name that's supposed to be in place to act as a barrier. I'm not saying they're responsible for causing it. I'm not saying that they should have treated it in a manner such that it would have healed. I'm saying that her lying in her feces and urine on each and every one of those times, Dr. Paintsill had an obligation to prevent that from taking place because of the statute. He saw it. He knew it. And all they had to do was to go ahead and put a gauze with medication that would have had a petroleum based barrier that would have protected her. So especially because she's dying, especially because she's in this debilitated state, you need to do everything you can to minimize the pain and suffering she's having. And they not only let her lie in her stool, they did it knowing he did it knowing full well that there was a medication available that would relieve it. So you're right. Most of the trial was about the death and the cause of the death. The focus of the appeal is the jury got lost in the very narrow aspect of the pain and suffering of this woman lying in feces and urine because the missing ingredient that Dr. Paintsill ordered wasn't there and he lied about it and he doctored the records because he didn't want to get in trouble. So what I'm suggesting, what I'm stating unequivocally, it was unrebutted in this case by Dr. Young, by the defendant, by Dr. Oosterbaan, by anybody, that her lying in stool and urine caused pain and suffering because that duoderm dressing was not there. That's what this is all about. And there were multiple, multiple opportunities that Paintsill admitted where all he had to do was pick up the phone and this would have ended. You want to talk about a decubitus ulcer and the failure to use the proper gauze petroleum product. But the truth of the matter is that you're trying to narrow it down like this and the case that you tried was like this. The case itself is even bigger than that because here you have a woman who was treated in six nursing homes, five hospitals and whose condition progressively got worse. And the neurological testimony, expert testimony in the case was that she had an incurable, fatal neurodegenerative disease causing progressive deterioration of her brain and spinal cord. And that all of these neurological problems led her to have more difficulty being treated for any condition that she would have, whether it's a decubitus ulcer or a fever or anything. And you can try to narrow it down to what this doctor didn't do in terms of reporting. That's not the way the case was tried. And that's not the record of the case in front of us. And the record in the case in front of us, the jury could have properly decided that it was the negligence or conduct of somebody else other than the doctor, namely the nurses and all these nursing homes and hospitals that caused her pain and suffering. Or they could decide that there's no proximate causation because the sole proximate cause was the underlying condition itself. I don't know how we can rewrite the script of the trial and throw everything out of the way and ignore the legal precedent, even though you got nothing but sympathy from us in terms of what happened to this poor thing. Your Honor, with all due respect, and I think I've heard you make this argument before yourself, that just because you have a blind person doesn't mean you can throw them out into traffic. And that's what happened here. You are correct that the majority of the trial, the focus was on all kinds of other issues. But to suggest that somehow it was proper or permissible for the jury to conclude that Dr. Paine Seale could violate a statute that has an absolute requirement that he put a stop to this by bringing in the Department of Public Health while she's dying is unsupported by any of the evidence or the argument or the precedent. That's what you're saying. And you have to persuade us that... All right, we're going to have to move on. You guys are arguing the same point over and over. I think unless he's got something else, I think the appellee should have his opportunity. You've had 28 minutes, of which probably five or... So you had about 25 minutes. I'm going to let the appellees have a few words to say. Thank you. Thank you, Justice Smith. May it please the court. Josh Vinson on behalf of the defendant, Emmanuel Pantzl, MD. And just for the record, I want you to know that I am actually about 10 years younger than I look on this Zoom video. Overruled. You know, this case was tried twice. And the first trial resulted in a hung jury. And so now going into the second trial, the plaintiffs really got every advantage. They've seen the entire defense case. They got to see what the defense strategy was, how the defense case went in. So they had every advantage going into the second trial. And yet the second jury found no liability. So you got a hung jury, couldn't be persuaded. You got a second jury, not guilty verdict. And then you got the trial judge who looked at this, and the trial judge agreed. The trial judge said that he did not feel that the jury's verdict was unreasonable or arbitrary or not based on the evidence. So you got three, you know, and I use the term loosely, three fact finders who have looked at the evidence, and they didn't see it the way Mr. Blandin describes the case. They saw a different case. You know, and I point that out because, you know, it's really important to the standard of review. And, you know, and as the court, I think, has recognized already in some of Justice Leaven's points about the standard of review that applies here. There's a lot of deference given, you know, to the jury, obviously. But there's also an awful lot of deference given to the trial judge. I mean, that's really whose decision we're reviewing. And they all, they were all there. They heard these witnesses. They heard all the evidence. They didn't just hear the side of it that you just heard Mr. Blandin give. And based on all the evidence, the jury came to the conclusion that there was no liability in this case, that Dr. Paintsill wasn't responsible. So I think standard of review is probably, you know, one of the most important things here. And I think it's also really important to recognize that, you know, the plaintiff, in essence, is conceding they got a perfect trial. I mean, there is absolutely no claim in this case whatsoever that it wasn't a fair trial. You know, all the evidence the plaintiff wanted to get in, went in. All the evidence the plaintiff wanted to block the defendant from getting in, was blocked. There's no claim that there was any evidentiary error whatsoever. No misconduct, nothing. So you got a perfect trial, one hung jury, a second jury says no liability, and a judge that says, a very experienced trial judge, who said, no, I don't think the jury's verdict is unreasonable, arbitrary, or not based on the evidence. So those are some pretty, you know, that's like three swings at the very same pitch. You know, you're getting a look at the exact same pitch and you've missed it every single time. I think that tells you that there's something wrong with the plaintiff's case, that the plaintiff isn't recognizing, but that the jury and the two juries in the trial judge did. Now, the trial judge was pretty specific in his ruling. You know, he said he actually thought that Mr. Blandon proved to breach the standard of care, but he, as you pointed out, Justice Lavin, he felt that they didn't prove proximate cause. And, you know, there are, as the courts pointed out, any number of proximate cause issues that the jury could have gone down in many different paths. You know, the last point Mr. Blandon made was the argument that, well, you know, if Dr. Paintsill had made a report of abuse, then the Department of Public Health would have come in and found abuse and shut down the whole operation, prevented anything further from happening. But, you know, there is an enormous, significant amount of evidence that established that if the Department of Public Health had come in, they could have concluded, as the jury concluded, that despite what the evidence, you know, the initials that Dr. Paintsill made and the evidence, you know, Dr., remember, you know, all the admissions that Mr. Blandon is talking about by Dr. Paintsill were all explained by him at trial. And the jury had to hear those explanations. But the point is, is there was a lot of expert testimony that if the Department of Public Health had come in, they would not have found abuse and neglect. And there's, you know, I want to recount a little bit of that evidence because, you know, the plaintiff's got to show a clear abuse of discretion by Judge Lyons in denying the request for a new trial. That means, you know, Judge Lyons, no reasonable judge could have ruled the same way Judge Lyons did after hearing this entire trial. And he said at the hearing in the post-trial motion, he remembered this trial vividly. He said he had a vivid memory of it. So obviously he was not impressed with the evidence on proximate cause either. And that was what he made clear. So I want to focus a little bit on that proximate cause issue because, you know, it's Dr. Young's testimony was certainly very strong, very persuasive. But, you know, there was an awful lot of admissions made by the plaintiff's own experts. You know, Dr. Braund, who was their opening expert at pages 365 to 70 of the record, she testified that the pressure sores were unavoidable. And the evidence that LaTosha Mims was in the, and I'm quoting, unavoidable pressure sores category, unavoidable pressure sores category, quote, will have them even with good assessment and interventions. And that goes right to your point, Justice Lavin, about, you know, Dr. Young's testimony that this was all the result of the very unfortunate illness this woman had. Let's take a look at the number of pressure sores. You know, in the two years that LaTosha was at Alden under Dr. Paintsel's care, she had four pressure sores. In the six months after she left Alden and went through several hospitals, under hospital care, which of course is much more, I'm not saying she was an intensive care unit, but it's much more intensive care in a hospital than you're going to get in a nursing home. And during the six month period she's in the hospitals, she has 34 more pressure sores, four while she's at Alden. Now the jury could draw an inference from that, that there was no abuse and neglect, that IDPH would not find abuse and neglect under those circumstances. Three of the pressure sores, the first three that she had after she came to Alden, were all healed. They were treated and they were healed. Now, you know, again, if you were to buy, you know, Mr. Lavin's, you know, sort of lopsided view of the evidence here, you know, how could these pressure sores, if they were as 88 times as he claims, and that was not evidence, there was no evidence that 88 occasions she was found with an exposed pressure sore lying in feces, that's just not true. There's nothing in the record to support that. But putting that aside, you know, the fact is, they wouldn't have healed. If that had been the case, but they did heal, and they healed in a reasonable amount of time that's what medical testimony was in this case. Dr. Braun, page 406, all you can do is treat and hope they heal. Dr. Braun at page 344 admitted that the wounds were kept clean and dry. Dr. Darlington, a nurse expert for the planet, healed and reappeared. That does happen. All the experts, all the witnesses, the medical experts testified that you can heal these things, but they will reopen I mean obviously the tissues in that part of the body that have been subject to the pressure have weakened. Okay, the skin has become thinner. There was testimony in the record that it can shear and tear just like wet newspaper. After a certain point in time because that's the nature of the illness. Okay, you can infer a jury can fairly infer from that expert testimony that there was no abuse or neglect. The charts, you know, if you read this entire trial transcript, you know, the Dr. Braun plaintiff's expert was walked through all kinds of chart entries, Manny Young the wound care nurse walked through all kinds and that was again another plaintiff's witness walked through the chart entries on wound care, Dr pencil spent hours on the stand, walking through his charting, you know, everybody agreed is charting didn't, it was hard to read, but he explained it all. And the jury heard his explanations and that's their job and that's what judge Lyons heard, they heard his explanations, they could conclude from that, that there was no abuse and neglect that the care was was consistent and that it was, it was careful that was detail. So there's that inference that you can draw the, you know, there's this argument that Mr. Blandon hammers away at nonstop in his brief and in this argument today about the exposed wounds lying in waste. And you know, again, undisputed undisputed evidence that she is incontinent of bowel and bladder incontinent of both undisputed that she is on a very high nutrient food regimen. So they are pushing food on this woman double portions high nutrient puddings. I mean, everything. It's understandable that she may be having frequent bowel movements. It's undisputed. There was testimony that because she's incontinent of bowel and bladder. And because she can't speak that you could change this woman's dressings and diaper and leave the room and she could have a bowel movement or urinate herself moments later and soil her diaper, and they wouldn't know for you know an hour and a half, two hours whatever the interval is before they come back to change her or move or change her position, and then they would discover it so it's entirely possible that those things could happen but that's not abuse and neglect you can infer that that is not abuse or neglect. You know there's photos in the record. And they're hard to look at. I mean, I couldn't agree more, they're hard to look at but you know what's significant when you look at the photos of the wounds, they're clean, they're dry. She's not lying in feces, and the dressings around them are clean and dry, they've been pulled away to take photographs picture so there's no there's no photographic evidence of her with these, you know, they describe in their brief these feces encrusted pressure source. That's just testimony that the jury was free to disregard if they didn't feel that that was true. There was undisputed evidence that she would scissor her legs you know she was she was partial quadriplegic not a complete quadriplegic so she was capable of some movement, and she would scissor her legs. Her mother, Mary bends testified that she would also and this is at page 684 the record that anytime she felt discomfort because she was wet or it's all yourself. Latasha would grab at her dress or her diaper grab at it that because she was uncomfortable. And again, the jury could make a reasonable inference from that. And yet there might be occasions where a bandage would come off where she would be soil. But again, that is not evidence of abuse and neglect that would necessarily lead ID pH to come in and shut down the whole operation or, or to change the care that was being rendered to Natasha. There's one, there's one pressure sore that doesn't heal. And that's the one at the very end. And you know the undisputed testimony there as I think the court has already recognized is that she was totally decompensated this point I mean Dr pencil, unfortunately, you know, took this patient on during the last two years of her life. She had been a nursing home for gosh I think it was over 12 or 13 years at this point, but he's got over the last two years and you know everything seems to her nutrition albumin levels, normal, all the way through his care she's getting the proper nutrition pressure sores are healing. At the end, suddenly her albumin levels drop the expert testimony is now she's become hyper metabolic. She can't, you know, metabolize the food in a way that will help her heal and mountain meet an immune response to the problems that she's having physically, and now they now they can't stop it. Now it's like an unstoppable train and they got her on IV antibiotics, you know, there's no question that those those dressings and charting shows they're aggressively trying to change it and clean it and keep it, you know, get it to heal can't do it this is her body. Now, that is just breaking down. And so at that point she's transferred to Mercy Hospital for care you know at that point, Dr pencil the record showed was even recommending that she get a feeding tube to try and improve the nutrition so she can mount a better immune response and the record that the testimony was that her mother refused to feeding back, you know, the feeding tube. So she didn't get that until she got transferred to Mercy Hospital, and Dr pencil couldn't do that on his own he needed a mother's approval she had our, our health care. And so she goes off to the hospital, and as the courts already pointed out there's like another four or five hospitals over the next six months, 34 more pressure ulcers develop under intensive hospital care, and she dies, I mean, doesn't really address any of this in this brief. You know, if you look carefully plaintiffs main brief, you know, pages, 27 to 28 of their main brief is about three or four paragraphs that talked about proximate cause they don't address any of this evidence. And when you get to plants reply after we've recounted all this in our brief. There's, there's two pages. And I'm talking about like one or two sentences on two pages pages four and six, where they talk about proximate cause just the conclusory argument. Well if I DPA to come in, they would have changed everything they would have intervened and stop this problem with her care. That's all they say they don't address any of the evidence that I've mentioned during this argument they don't address any of that proximate cause evidence that has been recounted in our brief. And so, you know, it kind of makes clear, you know, to sort of pull the whole thread through. That's why the first jury hung. That's why the second jury found no liability, based on this proximate cause problem. That's why Judge Lyons, as I said, very experienced trial judge heard the whole thing said, Yeah, I think maybe approves for each of the standard of care, but not proximate cause. I didn't say he didn't prove proximate cause but he denied the motion and that was the only thing he said he thought kind of proved his breach of standard of care. So the implication is, he agreed, he did not think that the jury's verdict was unreasonable arbitrary not based on the evidence that came to the issue, approximate cost. So, you know, none of that is addressed in the plaintiff's brief. Now, is it a tragic case. Yes, no question about it. Is it a sympathetic case. Absolutely. Probably one of the most sympathetic cases I've ever seen in my career. But, you know, we instruct the jury to put aside sympathy. And, you know, we all like to think that the jury follows the court's instructions we presume that the jury follows the court's instructions. And what we have here is not a rare, well maybe it's a rare case in the sense that the jury followed the facts. And that's what we did, that's what they did. And I think that, in fairness, that's, you know, that's what the court is obligated to do to, you know, and I think that, you know, while I said sympathetic case, that is not a basis for overturning the jury's verdict or reversing Judge Lyons eminently reasonable determination plaintiff has not shown that was was an abuse of discretion in a not clear abuse of discretion is not shown that at all. There is no no basis for reversing this this verdict in this case. Any questions. No questions. I have none. Stephen, you may go ahead. Thank you, Your Honor. The, the key critical issue, the misrepresentation that takes place is that we have to prove neglect and abuse, the focus here is solely on neglect. It was unrebutted by pain so that he observed neglect that it was a repeated basis that took place. And there's a distortion and misrepresentation that I believe is being perpetrated as to what the duoderm function is. This is not a situation where you have a patient who can defecate. And then they come back later and they have to clean it. This is a situation where that duoderm dressing has to be applied 24 seven, so that regardless of when she defecates regardless of when she urinates, there is a dressing in place to protect that wound. And Justice Lavin is correct. I am focused on that narrow issue. I fully recognize that there are other arguments that were presented to the trier fact in this case, and that I would not, I am not able to meet my burden of proof. However, the pain of suffering that took place on this narrow focused issue was unrebutted. It was admitted to by Dr. Young. It was admitted to by Dr. Oosterbaan that when you have an open exposed to cubitus ulcer without a duoderm dressing in place, as pain still testified, he observed on numerous occasion, that is a cause of pain and suffering. There was no other explanation for that in this particular case on that aspect. And yes, this is a, this is a young woman who had all kinds of other issues that were highly contested. This is a significant component of her pain and suffering case that was not contested by anyone in the case. And the entire focus, the entire issue at trial, and on post trial motion, and in the majority of the brief was whether the defendant has an obligation or not to report, and the state will come in and intervene. The intervention that we're talking about, shutting it down is the most extreme. Telling the nurses, forcing the nurses, requiring the nurses to place the dressing in place is the first line of defense. Providing another nurse to provide the dressing change is a second line of defense. Transferring her to another outside facility is another line of defense. The simple point is that this system is set up so that a doctor is required to place a call immediately, an investigation ensues, the facility has an IDPH representative come in, and the situation is corrected so that the next occasion doesn't occur, and the next and the next. This is not an isolated instance that happened. This, according to Dr. Painsil, this process began when she was admitted to the facility within months, he began to notice instances of neglect. He saw it on a repeated basis. He claims to have told Manny Young that this took place, but he admits he didn't put it in the chart. He admits that he was afraid not to contact IDPH and have them come out because of the personal repercussions to himself. That is undisputed. Thank you. Any questions? No questions. Thank you both very much. Sorry about your speaker. I'd suggest that you not do it that way in the future. But whatever. You both made very decent presentations. This is a very tough case. I personally had a daughter that went through some of this. Not like that, though, but it's rough on everybody. So I appreciate your time and your efforts and we'll let you know as soon as we see the results.